<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| INTERNATIONAL DEVELOPMENT LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 09-2495 (GEB) |
| ) | |
| SIMON NICHOLAS RICHMOND and ) | |
| ADVENTIVE IDEAS, LLC, ) | ***MARKMAN* OPINION** |
| ) | |
| Defendants. ) | |

<u>**BROWN, Chief Judge**</u>

This matter comes before the Court upon a request by the parties for claim construction in a *Markman* hearing. The parties identified seventeen (17) different terms that must be construed in their Joint Claim Construction Charts ("'477 JCC" and "'827 JCC"). (Doc. Nos. 54-1, 54-2.) The parties filed their opening briefs on July 20, 2010 (Doc. Nos. 60, 61), and their responsive briefs on September 24, 2010. (Doc. Nos. 63, 64). After the briefing was completed, the case was put on hold for the purpose of settlement negotiations. The parties failed to settle the case and the *Markman* was rescheduled for November 4, 2010.

**I. BACKGROUND**

International Development brought this is a declaratory judgment action against Richmond and Adventive Ideas for non-infringement and invalidity of patents directed to solar-powered garden lamps that can produce a variety of colors of light. (Compl. at ¶4; Doc. No. 1.) There are two patents at issue, U.S. Patent Numbers 7,196,477 (the "'477 patent") and 7,429,827 (the "'827 patent"). The patents are both titled "Solar Powered Light Assembly to Produce Light

1

of Varying Colors."  The '827 patent is a Continuation in Part ("CIP") of the '477 patent and the patents share an almost identical specification.  The primary differences between the specifications are that the '827 patent includes one additional page of figures and their accompanying description ('827 patent, Figs. 11-13), and the '827 patent's Summary of Invention describes the new claims.  ('827 patent, 1:38-3:55.)

After Defendants suggested to International Development's customers that its products infringed their patent, International Development filed a Complaint (Doc. No. 1) alleging that it did not infringe the patents and that the patents were invalid.  The parties requested a *Markman* hearing to construe the claim terms.  On November 4, 2010, this Court held the hearing and decided the constructions of fourteen (14) of the seventeen (17) terms and set forth its reasons on the record.  The remaining three (3) terms are the subject of this opinion.

## II.   DISCUSSION

### A.   Standard of Review

The first step in a patent infringement analysis is to define the meaning and scope of the claims of the patent.  *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  Claim construction, which serves this purpose, is a matter of law exclusively for the court.  *Id.* at 979.  Specifically, the focus of a court's analysis must begin and remain on the language of the claims, "for it is that language that the patentee chose to use to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'"  *Interactive Gift Express, Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112, ¶ 2).

Generally, there is a presumption that the words of a claim will receive the full breadth of their ordinary meaning.  *NTP, Inc. v. Research In Motion, Ltd.*, 392 F.3d 1336, 1346 (Fed. Cir.

2004). The ordinary meaning may be derived from a variety of sources; including intrinsic evidence, such as the claim language, the written description, drawings, and the prosecution history; as well as extrinsic evidence, such as dictionaries, treatises, or expert testimony. *Id.*

When determining the ordinary meaning of the terms, the court must give primary consideration to the intrinsic evidence, including the specification. The specification "is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1587 (Fed. Cir. 1996). However, it is improper to import limitations from the specification to the claims. *Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1364-65 (Fed. Cir. 2003). In addition to the specification and intrinsic evidence, a court may also consider extrinsic evidence when an analysis of the intrinsic evidence alone does not resolve the ambiguities of a disputed claim term. *Vitronics Corp.*, 90 F.3d at 1582-83.

The presumption of ordinary meaning may be rebutted if the patentee acted as his or her own lexicographer by clearly setting forth a definition of the claim term unlike its ordinary and customary meaning. *Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298-99 (Fed. Cir. 2003). The patentee's intent to define the term must be clear before the court will use a passage to redefine the term and impose limits on the ordinary meaning. *Merck & Co, Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005). Indeed, the Federal Circuit has "repeatedly encouraged claim drafters who choose to act as their own lexicographers to clearly define terms used in the claims in the specification." *Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007).

When the patentee has not provided an explicit definition of a claim term, the words of a claim are given their plain and ordinary meaning to a person of ordinary skill in the art. *Vitronics*, 90 F.3d at 1582. The person of ordinary skill in the art is deemed to have read the

claim terms in the context of the entire patent, including the specification. *Phillips*, 415 F.3d at 1313.

### B. Application

While the Court construed the majority of the disputed terms at the *Markman* hearing, three require additional discussion. These terms are "the switch being exposed to provide access thereto," "switch being accessible to the user," and "a solar panel mounted on a surface of an assembly." The Court will discuss the terms in that order.

#### 1. *The switch being exposed to provide for access thereto*

This term appears in claims 1 and 20 of the '477 patent. ('477 patent, Certificate of Correction at 1-2.) Plaintiff proposes that the term should be construed to mean "the switch is immediately accessible to the user without the need to disassemble any component of the lighting device." ('477 JCC at 8-9; Doc. No. 54-1.) Defendants propose that the term should be construed to mean "the switch is made visible to the user or deprived of shelter or protection to make it available to the user without the need for tools or destruction." (*Id.*) The essential difference between the constructions is that Defendants' construction allows the switch to be under a shield or access panel so long as tools or destruction are not necessary to access the switch.

The Court adopts Plaintiff's construction because: (1) in this context, the ordinary meaning of the term "exposed" requires that the switch be on an external surface without any cover between it and the user, (2) Defendant argued for this meaning in the prosecution history in order to distinguish another patent, and (3) this construction finds support in the specification.

The ordinary meaning of the term "exposed" in the context of a switch means that it is "exposed" to things that are external to the device and not covered by any shield or similar

4

object.[1]  Merely being accessible without tools is not sufficient to be "exposed."  A car's gas cap is not "exposed" because a metal shield covers it, but it is accessible without tools because the user can simply open the shield to access the cap.  A pen with its cap on does not have its tip "exposed" despite the fact that it is easily accessible by simply removing the cap.  Thus, the ordinary meaning of the term "exposed" suggests that there is no shield, cap, or other cover intervening between the user and the switch and that access without the use of tools is insufficient to be "exposed."  *See NTP, Inc. v. Research In Motion, Ltd.*, 392 F.3d at 1346.

The prosecution history also strongly suggests that the word "exposed" should be construed in line with its plain meaning, requiring it to be on an external surface.  The patentee distinguished the Shalvi patent by adding the word "exposed" to the language to clarify that this patent was different than Shalvi because Shalvi's switch was not "exposed," but was "hidden *or not immediately accessible from outside the housing* to prevent switching ON and OFF by unauthorized persons."  (Hilton Decl., Ex. C. at 11; Doc. No. 60-5) (emphasis added.)

Thus, if the '477 patent is truly distinguishable from Shalvi based on the placement of its switch, its switch must be different than the Shalvi switch.  Because the Shalvi switch was "not immediately accessible from outside the housing," then the '477 patent's switch would have to be "immediately accessible *from outside the housing*."  (*See* Hilton Decl., Ex. C. at 11; Doc. No 60-5.)  Thus, the switch cannot be within a plastic shield or cover; it must be *outside* the housing.  Further, in this same section of the prosecution history, the patentee cited to a portion of the specification to prove to the patent office that this change was supported in the original written description.  This portion disclosed a switch that was "on a downwardly facing *external* surface."

---

[1] This is fundamentally different from what it means to have a solar panel that is "exposed" to light as reflected in the Court's ruling on the "exposed to light" term.  Light can permeate clear plastic, a user's hand cannot.  Thus, while a solar panel can be exposed to sunlight even through a clear plastic shield, a switch cannot.

(*Id*.) (emphasis added.)  The patentee cannot distinguish prior art by saying that its switch is immediately accessible from outside the housing and support that change with a reference to a switch on an external surface and then argue, contrary to the ordinary meaning of the term, that an exposed switch may be inside the housing.  Consequently, the prosecution history supports construing the term to require that the switch be on an external surface and accessible without the need to disassemble the item or use an access hatch of any kind.

The specification also supports this construction.  The specification shows several embodiments where the switch is on an external surface and no embodiments where the relevant switch is inside the housing.  In Figure 10 and its accompanying description, the switch is on an external surface.  The description states that:

> The embodiment of FIG. 10 includes an ornamental garden light . . . . The switches 40 and 65 would be mounted at an external surface of the base 74.
>
> The switch 40 and/or switch 65 would be mounted on an external surface of the base 74, while the diode 42 would be exposed to sunlight.

('477 patent, 7:3-12.)

Even the primary figure that Defendants cite, Figure 4, supports this construction.  As Defendants concede, switch 40 *is* labeled on the drawing and is on an external surface.  (Defs.' Br. at 23-24; Doc. No. 61.)  This is the switch that is described in the claims, i.e., the switch that is "operated to control delivery of electric power from the battery to operate said circuit."  ('477 patent, Certificate of Correction at 1.)  This is demonstrated by Figure 9, which shows switch 40 as the one that connects the battery to the circuit.  (*See also* '477 patent, 4:20-25.)  Defendants cite the fact that switches 69, 70, and 71 are not shown on the external surface in Figures 4-6.[2]

---

[2] This is unpersuasive because there are many things in Figures 4-6 that are not labeled.  In fact, in the cross sections in Figures 2 and 3, which show the insides of an embodiment, the switches are similarly not labeled.  Thus it is possible that the switches 69, 70 and 71 are depicted on an external surface but simply are not labeled.

However, these are not the switches mentioned in the claims, rather, they correspond to the individual light emitting diodes and do not connect the battery to the circuit; they connect the battery to the specific lamps. ('477 patent, 5:15-35, Fig. 9.)  In fact, these switches are explicitly disclosed in some cases as being "not readily accessible by a user." ('477 patent, 5:30-35.)

In summary, the specification discloses embodiments where the relevant switch is on an external surface but nowhere discloses this switch within a housing or under a shield that requires an access hatch.  While the absence of such an embodiment from the specification is not determinative, because the plain meaning of the term "exposed" requires the switch to be external, these embodiments support the meaning of the terms and do not import a limitation into them.  *See Phillips*, 415 F.3d at 1320 (it is a cardinal sin of patent law to read a limitation from the specification into the claims).

Consequently, this Court construes "the switch being exposed to provide access thereto" as "the switch is immediately accessible to the user without the need to disassemble any component of the lighting device."

### 2. *Switch being accessible by a user*

This term is different from the previous term "switch being exposed to provide access thereto" and should be construed differently because it does not include the word "exposed" and it appears in a different patent, the '827 patent (at claims 27 and 35).  Nonetheless, both parties propose an almost identical construction for this term as for the previous term.  Plaintiff proposes that the term should be construed as "the switch is immediately accessible to a user without the need to disassemble any component of the lighting device." ('827 JCC at 15-16; Doc. No. 54-2.)  Defendants propose that the term should be construed to mean "the switch being available to the user for use, without the need for tools or destruction." (*Id.* at 16.)  Again, the essential

difference between the constructions is that Defendants' construction allows the switch to be under a shield or access panel so long as tools or destruction are not necessary to access the switch.

This Court construes the term to allow a shield, an access panel, or some disassembly because without the term "exposed," the ordinary meaning of the term "accessible" includes some effort by the user. The specification also supports this construction.

Because this term does not include the word "exposed," this term's plain meaning suggests a construction that rests somewhere between the parties' proposals. To be accessible, an item need not be available without any disassembling. Certainly, the tip of a ball point pen is accessible even if the cap must be removed from the end. This shows that something can be "accessible" even if some disassembly is required. However, there are also items that can be taken apart without tools or destruction but require great effort to do so and would not be considered "accessible." For example, the plastic seat-belt covers near the door of some cars can be removed without tools or destruction, but it would require substantial effort. They are not "accessible." As such, the ordinary meaning of the term is more like "the switch is accessible to the user without substantial effort, tools, or destruction."

The specification also supports the ordinary meaning of the term. While at first blush Plaintiff's citation to the specification seems to contradict the plain meaning of the term, upon further inspection, using Plaintiff's citation reads a limitation into the term. Using this portion of the specification would change the term from "accessible" to "readily accessible." Further, the original claims of the '477 patent suggest that this portion of the specification refers to a different claim.

The Plaintiff cites the following passage:

> The switch 40 and/or switch 65 is/are mounted on the base 26 <u>so as to be on a downwardly facing external surface</u> of the base 26. This enables a user to control the device via <u>readily accessible</u> switches, without needing to remove the cap assembly 24.

('827 patent, 8:3-7) (emphasis added.) This is the only place in the specification where the word "accessible" is used in the context of the switches. However, it does so by adding an additional limitation – "readily" – that implies even more ease of accessibility than "accessible to the user." *See id.* This passage describes what "readily accessible" means, not what "accessible to the user" means. Thus, reading this passage to define "accessible to the user," as Plaintiff does, improperly reads the additional limitation "readily" into the claim. *See Phillips*, 415 F.3d at 1320 (it is a cardinal sin of patent law to read a limitation from the specification into the claims).

Further, this passage from the specification was present in the original '477 patent and in that patent the passage was reflected in the claims using the word "exposed." The '477 patent's claims reflected this language when it used the language "the switch being *exposed* to provide for access thereto by a user" ('477 patent, 8:49-51) (emphasis added) and "the second switch being operable to select a desired fixed colour and *exposed* to provide access thereto by a user." (*Id.* at 8:1-2, 9:4-5, 10:9-11) (emphasis added.) It was only after the following embodiment was added in the CIP that "accessible to the user" appeared as claim language:

> To provide access to the batteries 33 and the switches 40 and 65, the lens 101 is rotated about the axis 119 relative to the base 106 so there is relative movement between the flanges 116 and 117. This relative movement removes the base 106 from the lens 101. Accordingly, a user may then manipulate the switches 40 and 65. [3]

('827 patent, 8:66-9:4.) Thus, when this disassembling embodiment was added, the claim language "accessible to the user" also appeared. Alone, this would not be enough to define the

---

[3] Defendant argues that to adopt Plaintiff's construction is to read this embodiment out of the patent. However, this is not the case because this type of arrangement is specifically claimed in the '827 patent's first claim. ('827 patent 9:10-30.)

9

term in a similar manner in the '827 patent because the '477 patent's specification may disclose what it does not claim and this CIP embodiment also appears in Claim 1 of the '827 patent. ('827 patent, 9:10-30.) However, because Plaintiff's reliance on the first passage reads "readily" into the claim and the ordinary meaning of the term "accessible" allows a person to perform some disassembly, this embodiment does lend some additional support for the Court's construction.

Thus, this Court construes "switch being accessible to the user" to mean "the switch is accessible to the user without substantial effort, tools, or destruction."

### 3. *A solar panel mounted on a surface of an assembly*

This term appears in the '477 patent at claim 20. ('477 patent, Certificate of Correction at 2.) Plaintiff argues that the term is indefinite but does not take any other issue with Defendants' construction. (Pl.'s Br. at 19-21; Doc. No. 60.) Defendants' construction is:

> The "surface" is any surface of "an assembly" (i.e. multiple parts) that is able to receive light, such as from the sun to permit the solar cell to generate electricity, directly or indirectly. That "surface" can be covered by a transparent or translucent cover, providing it is transparent or translucent to light. Well-known that the "surfaces" of a hollow body include both internal and external surfaces.

('477 JCC at 10-11; Doc. No. 54-1.) While Defendants' construction is somewhat confusing, it clarifies two elements: (1) "an assembly" means "multiple parts"; and (2) that assembly's surface, which is exposed to light, may be exposed through a transparent or translucent shield. Thus, stated differently, the construction might be "a collection of parts having a surface that is exposed to light, including being exposed through a transparent or translucent cover, and a solar cell being mounted on said surface." For the reasons stated below, the Court will defer Plaintiff's indefiniteness argument until summary judgment, and will adopt this modified construction.

### a. Indefiniteness

The Court defers Plaintiff's indefiniteness argument until summary judgment because, while indefiniteness has the same construction underpinnings as a *Markman* hearing, two reasons make it more appropriate to defer it until summary judgment: (1) the high burden of proof required to show indefiniteness and (2) its potentially dispositive, patent-invalidating nature.

First, there is a high burden of proof on a party challenging the patent based on indefiniteness, which would be difficult to meet at this early stage. Indefiniteness is proven only "where an accused infringer shows by *clear and convincing* evidence that a skilled artisan could not discern the boundaries of the claim" based on the intrinsic evidence or knowledge of the relevant art area. *Halliburton Energy Servs., Inc. v. M-I LLC,* 514 F.3d 1244, 1249-50 (Fed. Cir. 2008) (emphasis added).

Second, rather than giving meaning to a claim, as a *Markman* hearing is meant to do, indefiniteness invalidates the patent claims entirely. *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1376 (Fed. Cir. 2001). This dispositive effect is more appropriately tackled at summary judgment. Thus, this Court finds persuasive the determinations of several other courts to defer indefiniteness until summary judgment. *See*, *e.g.*, *Intergraph Hardware Techs. Co. v. Toshiba Corp.*, 508 F. Supp. 2d 752, 773 n.3 (N.D. Cal. 2007) ("[The] indefiniteness argument is inappropriate at the claim construction stage."); *Pharmastem Therapeutics, Inc. v. Viacell Inc.*, 2003 U.S. Dist. LEXIS 877, at *2 n.1 (D. Del. Jan. 13, 2003) ("[T]he court will not address the defendants' indefiniteness argument at [the *Markman* stage]."). Indeed, the Federal Circuit in *Halliburton*, *Exxon*, and *Datamize* reviewed courts that dismissed the case for indefiniteness at summary judgment, not at a prior *Markman* hearing. *Halliburton*,

514 F.3d at 1249; *Exxon*, 265 F.3d at 1373; *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).

It may be true that determining the indefiniteness of claim language is a question of law "that is drawn from the court's performance of its duty as the construer of patent claims," which is the same duty that gives rise to the *Markman* hearing. *Exxon*, 265 F.3d at 1373. However, this does not outweigh the previous practical considerations that militate against determining indefiniteness prior to the end of all discovery. Consequently, the Court will not entertain the indefiniteness argument and will construe the term because it is "amenable to construction, however difficult that task may be[.]" *Exxon*, 265 F.3d at 1375.

### b. Construction of the term

Plaintiff does not take issue with Defendants' construction other than by arguing that this term is indefinite.

The Court construes the term "a solar panel mounted on a surface of an assembly" in line with Defendants' construction because that construction has sufficient support in the specification and the ordinary meaning of the term supports the construction. As mentioned, Defendants' construction has two essential elements (1) "an assembly" means "multiple parts"; and (2) that assembly's surface, which is exposed to light, may be exposed through a transparent or translucent shield. These elements find support in the specification.

First, Defendants' construction of "an assembly" finds support in the ordinary meaning of the term and in two assembly examples in the specification. The ordinary meaning of the term "an assembly" is "a collection of multiple parts that are attached to one another," which is similar to Defendants' construction. Two portions of the specification disclose assemblies, one which specifically relates to the solar panel; both assemblies are collections of parts. (*See* '477

patent, 3:18-24 (describing a "lens assembly" as a collection of parts); '477 patent, 3:29-39.)

The portion that relates to the solar panel describes the "cap assembly,"

> Removably attached to the rim 22 is a cap assembly 24. The assembly 24 includes a cover 25 fixed to a base 26. The base 26 is located beneath the cover 25 and is shielded thereby. The base 26 and the cover 25 encompass a chamber 27 within which there is a mounted moulding 28. The moulding 28 is provided with battery compartments 32. The components of the circuit 29 are located within the chamber 27, while the upper surface of the assembly 27 is provided with the solar cell 30. The cell 30 is exposed through a central rectangular aperture 31 of the cap 25.

('477 patent, 3:29-39.) Thus, the cap assembly, which the solar cell is mounted on is a collection of connected parts. This is consistent with the ordinary meaning of the term.

Second, the Defendants' construction of "surface" as including a surface within a transparent or translucent cover finds support in the language of the claim. The embodiment discussed immediately above mentions that the cell is exposed through an aperture of the cap. However, this quote does not help this Court to determine whether the solar panel can be within an enclosed transparent shield. One of the diagrams may have such a shield, but lacks sufficient detail to be determinative. ('477 patent, Fig. 2.) Further, the word "exposed" in this context could include a transparent shield, and so could the word "aperture," which has a transparent shield in the context of a camera. Thus, this portion of the specification does not dictate that the panel be on an external surface.

Further, even if the passage did require exposure without a transparent or translucent cover, the claim term is not limited to this embodiment. There is nothing in the surrounding claim language that suggests that the assembly would have to be outside of the cover. The claim simply states "a solar cell mounted on a surface of an assembly so as to be exposed to light[.]" ('477 patent, Certificate of Correction.) Unlike a switch, a solar cell could be exposed to light within a transparent cover and still be able to create electricity. The context distinguishes the use

13

of the word "exposed."  A person inside a window is exposed to sunlight, because the sunlight is able to strike him, but a switch inside a window is not because the window interferes with a person's ability to physically manipulate it.  Thus, "exposed" in this context allows the use of a transparent cover.

Consequently, the Court construes the term "a solar panel mounted on a surface of an assembly" to mean "a collection of parts having a surface that is exposed to light, including being exposed through a transparent or translucent cover, and a solar cell being mounted on said surface."  However, this Court does so without prejudice to Plaintiff's ability to challenge the validity of this claim for indefiniteness at the summary judgment stage.

### III.    CONCLUSION

For the reasons set forth above, this Court construes "the switch being exposed to provide access thereto" as "the switch is immediately accessible to the user without the need to disassemble any component of the lighting device"; "switch being accessible to the user" to mean "the switch is accessible to the user without substantial effort, tools, or destruction"; and "a solar panel mounted on a surface of an assembly" to mean "a collection of parts having a surface that is exposed to light, including being exposed through a transparent or translucent cover, and a solar cell being mounted on said surface."  For the reasons set forth on the record at the *Markman* hearing, the Court construes the remaining terms as set forth in the accompanying order.

Dated: November 12, 2010

                                                      /s/ Garrett E. Brown, Jr.
                                          GARRETT E. BROWN, JR., U.S.D.J.